Wair *vs.* The State of Georgia.

THOMAS WAIR, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. Where on the trial of A for murder, it was in proof that A and B came to where the deceased was at work, and that the killing took place after an altercation in which A and B joined:
*Held,* that it was not error in the court to permit the state to prove that B had, in A's presence, not long before the killing, inquired of the witness if the deceased was at work at the place he was killed, especially as the further proof was that A then said he would give the deceased a lick if he said what he heard he had said.

2. It is not error in the judge, on the trial of a case of murder, after fully charging the jury as to the law applicable to the facts as they appear in the proof, to fail to charge the jury that section of the Code which provides that all other cases standing on the same footing of reason and justice shall be justifiable homicide.

3. As the defendant is clearly guilty of murder, if the principal witness for the state is to be believed, and as the prisoner's own confession makes very nearly, if not quite the same offense, we cannot say the verdict is illegal.

4. When the jury in a murder case, without any suggestion from the judge to mislead them in their verdict of guilty, recommend the prisoner to the mercy of the court, the verdict is not for this reason illegal,

the verdict not being founded solely on circumstantial evidence, and the court will not hear the affidavits of jurymen that they misunderstood the effect of their verdict.

Criminal law. Evidence. Charge of Court. Jury. Verdict. Recommendation to mercy. Before Judge HOPKINS. DeKalb Superior Court. September Term, 1873.

Wair was placed on trial for the offense of murder, alleged to have been committed upon the person of Lidwell B. Womack, on November 14th, 1872. The defendant pleaded not guilty.

The facts present substantially the following case :

One Frank Robinson, who was jointly indicted with the defendant, had had a law suit with the deceased, upon the trial of which the defendant was his principal witness, and testified directly contrary to the evidence of the deceased, and caused him to be unsuccessful in the litigation. This produced considerable feeling between deceased upon the one part and defendant and Robinson upon the other. The case made by the prosecution rested mainly upon the evidence of a colored man by the name of Harrison Marable, and the confessions of the defendant made to John Baxter, the sheriff of DeKalb county, about one week after the homicide. The former testified in substance as follows :

Deceased and witness were at work together in a ditch on the land of the former when the defendant and Frank Robinson came up. It was about three o'clock, P. M. They came down the ditch from Robinson's house ; had guns with them. They spoke to deceased in a friendly manner. Robinson said that he was going to make a good wood pasture, and wanted the deceased to allow his cattle to stay in the field. Deceased replied that it was all right. Something was then said about the ditch. Robinson asked deceased who swore a d—d lie about the ditch ? Deceased replied that he did not say that any one had sworn a d—d lie, but that he (Robinson) swore contrary to his (deceased's) testimony. About that time defendant turned and wanted to whip deceased. De-

ceased jumped back and defendant followed him. Robinson then said that he was going to kill a G—d d—d s—n of a b—h. They halloed, and Mr. David Dees (also jointly indicted with the defendant,) came up. Deceased got out of the ditch and commenced walking towards his house. Dees told him to stop for a few words. Robinson then threw his coat off and Dees asked if he would cut it out or fight it out. Deceased replied that he did not take his knife to fight with. Dees asked him who swore a d—d lie. Deceased replied that nobody swore a d—d lie. "Dees made at him." Deceased walked off, and got over the fence, going home. Robinson said : "Follow after him, kill the d—d s—n of a b—h." He spoke to defendant, who laid down his gun and went after the deceased. He cut deceased before the latter thought of shooting him ; he caught him on the other side of the fence, and cut him in the back and sides. Deceased then fell to the ground and shot defendant. "Defendant then let in to cut him until he killed him." Deceased arose, walked a few steps, and fell dead. Robinson took defendant home ; he walked as straight as witness. Did not swear upon the committing trial, and has not stated to any one that witness was in the ditch at the time of the fight and could not see it ; he followed right after deceased, and had reached the top of the fence at the time of the fight. Did not swear upon the committing trial and has not stated to any one that the defendant was on top of the fence at the time deceased fired.

John Baxter, sheriff, testified, substantially, as follows : Arrested defendant ; had a conversation with him about one week after the homicide ; he stated that the difficulty originated from a law suit between Robinson and deceased ; that he and Dees were witnesses for Robinson ; that Robinson wanted him (defendant) to go with him and see deceased in reference to allowing some cattle to remain a few days in a field of his ; that he replied to Robinson that he would not go unless he promised not to name the ditch (the subject of the law suit;) that Robinson thus promised, and defendant consented to go ; that they talked with deceased in reference

to the pasture, and agreed upon that subject; that nothing was said out of the way; that defendant then told deceased that he supposed that he said that Robinson and he (defendant) swore damned lies about the ditches; that deceased replied that he did not say so, and Squire Tilly would certify to the same; that defendant then said that he would die before he would take that lie; that defendant said no more until deceased started off, when he followed him up to the fence; that deceased got over the fence and defendant on top of it; that they were talking to each other all this time, but defendant failed to state what about; that deceased went eight or ten steps beyond the fence, then turned and came within four or five steps of defendant with his hand behind him, drew his pistol and shot him; that defendant then said: "You have killed me, and I will kill you if I can;" that defendant made at him, cut him a time or two, and threw him on the ground; that while he had hold of him deceased snapped his pistol once or twice, but did not know which way it was pointed; that when defendant threw him on the ground the pistol flew out of his hand and a bottle out of his pocket; that deceased begged him not to kill him, and he let him up; that deceased started off, cursing him; that defendant caught him again, threw him on the ground, and cut him a few times more; that deceased got up, walked a few steps, and fell dead. The pistol used by deceased was a small five shooter; one chamber was discharged, and the caps on two other chambers were indented as if they had been snapped. The defendant was badly wounded; the bullet entered just below the right nipple; he remained at his house about six weeks; was then brought to the jail in a spring wagon; he escaped since the last term of the court; he bored out of jail with an auger; he was recaptured in Milton county; the family of defendant live in DeKalb, not far from the Milton county line.

James Reeves testified to being present at a corn-shucking about one week before the killing, at which deceased, Robinson, Dees and defendant, were also present; that a difficulty was then imminent; that it was prevented by the crowd

Wair *vs.* The State of Georgia.

present; that witness asked defendant not to have a fuss; that he replied he would not, but that if deceased had said what he had heard, he would knock him down—he intended to have satisfaction.

Robert Ellis testified, in substance, as follows: Saw defendant and Robinson together on the day of the homicide. Defendant said that if deceased told him he had sworn a d—d lie, he would give him a lick that it would take him some time to get over. This occurred about ten o'clock in the morning. They were going hunting; had guns with them. While defendant was there, Robinson asked if deceased was at work on his place. Witness replied that he did not know.

This question of Robinson and the answer of the witness were objected to by the counsel for defendant, on the ground that no concert of action had been shown between defendant and Robinson. The objection was overruled, and defendant excepted.

Defendant then made the statement about giving deceased a lick,•etc.

Some additional testimony was introduced for the prosecution, not considered material.

Dyer Copeland, the brother-in-law of defendant, and also of Dees, John Chestnut, Robert Wilkinson, Samuel S. Harman and James Pierce, a brother-in-law of defendant, all testified that Harrison Marable, on the evening of the homicide, stated that at the time the shot was fired by deceased, he (Marable,) was in the ditch and defendant on top of the fence; that, consequently, he could only see defendant from his waist up; that he could not see defendant and deceased at all when they were fighting.

John W. F. Tilley and William J. Donaldson, justices of the peace, testified that upon the committing trial of Robinson, which was before them, they had great difficulty in obtaining a consistent statement from the witness, Harrison Marable; that he was confused; that his evidence, on the whole, was in accordance with his statements made to the

above mentioned witnesses in reference to the location of the various parties.

William J. Donaldson further testified that he was at a corn-shucking a short time before the difficulty, some two or three weeks before; that deceased and defendant were both there; that he was compelled to command the peace; that defendant was talking, not directly to deceased, but about him, and witness thought it likely the peace was about to be broken; that from the language used by defendant, he thought he was mad; that Robinson and Dees were at the corn-shucking, but does not remember where they were when he commanded the peace.

Mrs. Scinthia Norris, the aunt of the defendant, and her husband, James Norris, testified, that Harrison Marable, on Christmas eve after the killing, made the same statements to them as to the location of the various parties at the time of the homicide, as already stated by the other witnesses for the defense.

Robinson testified to facts which would have gone far towards the justification of the defendant. His evidence was unsupported by any other witness.

It was shown that deceased was cut in seventeen different places, six of which wounds would have proved fatal; that the defendant was shot some three inches below the right nipple and about four and a half inches from the centre of the breast, the ball taking an upward and outward direction towards the right shoulder; that the wound was very dangerous; that the ball was still in the body of the defendant, having lodged under the shoulder blade.

The jury found the defendant guilty and recommended him to the mercy of the court.

The defendant moved for a new trial upon the following grounds, to-wit:

1st. Because the court allowed, over the objection of defendant's counsel, the prosecution to prove by Robert Ellis that Frank Robinson inquired of him whether deceased was at work on his place that morning, it not appearing that there

was any conspiracy between defendant and Robinson at that time.

2d. Because the court, after having given in charge to the jury the sections of the Code referring to murder, manslaughter and justifiable homicide, failed to charge section 4268 of Irwin's Code, which is as follows: "All other instances which stand upon the same footing of reason and justice as there enumerated, shall be justifiable homicide."

3d. Because the verdict of the jury was agreed upon after it had been affirmed by jurors, during the consideration of the case, that a recommendation to mercy would authorize the court to sentence the defendant to imprisonment in the penitentiary, and the verdict would not have been rendered had it been believed that it would have resulted in a sentence of death.

4th. Because the verdict is contrary to the law and the evidence.

In support of the third ground the affidavits of two of the jurors were filed.

The motion was overrruled, and the defendant excepted.

HILL & CHANDLER; GARTRELL & STEPHENS; HILLYER & BROTHER, for plaintiff in error.

JOHN T. GLENN, solicitor general, for the state.

McCAY, Judge.

1. We think it was not error in the judge to admit the evidence that the defendant had inquired for the deceased, and whether he was at work at the place of the killing at the time the inquiry was made. Under the facts as they were developed, it was of much importance to the truth of the case to know whether the meeting between the defendant and the deceased was casual and accidental or was intended by the defendant. Did he go to where deceased was with intent to meet him, or having other purposes in passing that way? Was the meeting accidental or even incidental? This evi-

dence tended to shed light on that inquiry. Why inquire for the deceased? Why remark that he would give him a lick under certain circumstances? We think this fact was an important one, and indicated that much of the story told by the prisoner and those with him is not correct. We think it may be fairly inferred from this inquiry and this threat, that the meeting was intended, and that the prisoner and his party went to where deceased was at work with a set purpose to have a difficulty. This is a large element in the whole case, and goes of itself very far to cast suspicion on the theory of the defense and to justify the jury in believing the state's principal witness.

2. We think also the judge was right in refusing to charge section 4334 of the Code. There was nothing in the evidence to call for its application. The Code undertakes to specify instances of justifiable homicide, as self-defense, etc. It also specifies instances where the law makes a killing manslaughter only; it then in its care for human life, and in consideration of the known truth that it is impossible to foresee all contingencies, declares that all other cases standing upon the same footing of reason and justice, shall be dealt with in the same manner. It does not mean that we have no law of murder, and that in all cases the legal guilt or innocence of the prisoner are to depend on the enlightened conscience of the jury. There are no unusual, extraordinary circumstances here; nothing that human foresight might not well foresee. It is the old story of human passion and human disobedience of the laws of God and man, which begun with Cain, and will be continued, we suppose, until the last trump sounds. Either the defendant is guilty under the plain letter of the law, or he is innocent, or guilty only of some lesser offense than murder, under the expressed cases put by the Code. There is nothing unusual or exceptional in the case, nothing to call for the application of this section intended for unusual and exceptional cases.

3. If the principal witness for the state tells the truth the defendant is plainly guilty of murder; and even the defendant's

own story makes him grievously to blame. Considering that the jury had a right to believe that the prisoner and his party sought out the deceased with intent to quarrel with him, and considering that with two to one, and perhaps three to one against him, it is not probable that the deceased would have been the aggressor, we are not surprised that the jury gave credence to the story of the negro rather than to the other versions of the affair. This is a sad case of idleness and crime, and turns solely upon the credibility of the witness, and as the jury have evidently believed the story of the one who saw it all, and who tells his story with no motive to untruth, rather than the story of the others, who are more or less mixed up with the crime themselves, we feel it to be our duty to affirm the judgment refusing a new trial.

Judgment affirmed.